## Day & Night Nat. Bank of Pikeville, Ky., v. Blei.

(Decided Feb. 21, 1933.)

J. J. MOORE for appellant.
HARMAN, FRANCIS & HOBSON for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

On January 27, 1928, the appellee, George F. Blei, of Chicago, conveyed to Blaz Ruzic, of Alabama, certain standing timber in Pike county for a cash consideration of $14,313.75. The deed carried a general warranty of title. One Bud Williamson was asserting some kind of claim to a part of the timber, the value of which was agreed to be $634.50. In order to protect the warranty, that amount of the purchase price was not paid to the grantor, and at the time the deed was executed the parties entered into a contract which, after reciting the inducement, provided:

> "It is now agreed between the parties that said Ruzic shall proceed with reasonable dispatch in the cutting and removal of such trees, and until actually prevented therefrom by injunction, and said Ruzic does now deposit with the Day & Night National Bank of Pikeville, Kentucky, the said sum of $634.50 to be held in escrow by it until July 1, 1928, and if no suit be instituted by said date, the said Blaz Ruzic will execute an order directing said bank to pay to said Blei the full price for all trees which he has been able to cut and remove from said lands under the terms as above specified."

Two years afterward Blei sued the appellant, the Day & Night National Bank of Pikeville, Ky., and Ruzic, to have the fund paid him, and asked judgment against the bank therefor. It was charged that Ruzic had refused to cut the timber referred to; that the claim of Williamson was without merit, and Ruzic had not been prevented from cutting and removing the trees by injunction or otherwise; that he was able had he been willing to do so to obtain the timber; that he had wrongfully failed and refused to execute any order directing the bank to pay him the balance of the purchase price held by the stakeholder; and that he, the plaintiff, was entitled to have the court order the bank to pay over the money to him. Ruzic was brought before the court by constructive service, and entered no defense. The bank answered that the money had been deposited with it in escrow to be held until July 1, 1928, under instructions of both parties to pay it to Blei on the written order of Ruzic if Blei had delivered certain timber then

in question; and that Blei had failed to do this, and, upon Ruzic's request, the money had been paid over to him; therefore, that it was not responsible to plaintiff. The bank did not deny that the written agreement as to the deposit set up in the petition had been executed by the parties or that it had knowledge of its terms, or that it accepted the deposit on those terms. It only averred it was not a party to that agreement. Much of the petition remained untraversed.

There was a contradiction in the testimony of Blei and Graham, the former cashier of the bank, as to whether the copy of the escrow agreement was delivered to the latter. Mr. Graham testified that the men had advised him there was a dispute over certain timber, and Blei didn't know whether he could deliver it or not, and they were placing the money with the bank to hold until July 1, 1928. He then made a memorandum of those terms of deposit for the government of the bank's employees, and attached it to the account sheet. It could not be found, but the substance was that the bank was to hold the money until July 1, 1928, and if Ruzic did not get the timber the money was to be delivered back to him. It was understood, said he, that there must be an order from Ruzic before he could turn the money loose. Shortly before July 1st, Blei personally told Graham that their contract was about to expire, and that Ruzic had not cut the timber and would be contending for the money, but it should not be paid him, for as soon as he, Ruzic, had "cleaned up" and left, he, Blei, was going to make an effort to get the money. The cashier admitted that after July 1, 1928, Blei had made several demands for the money and the bank had advised him it would be held until the differences between the parties were adjusted.

The bank had loaned Ruzic $2,500, secured by a morgage on a lot of barrel staves. About this time all of the loan except the amount of the deposit, $634.50, was repaid and the mortgaged property shipped out. On July 14, 1928, Ruzic made a demand for the money. The bank as of that day withdrew the sum from a savings account in the name of Blei in which it had been placed. The money was held by the bank for the payment of the balance of Ruzic's note, although it seems not to have been then credited on it. About six months later, the note was surrendered to Ruzic as having been

paid. According to the cashier, although Blei felt that he was entitled to the money, yet as he had learned from Blei that Ruzic had failed to get the timber and under the contract of deposit Ruzic was entitled to have the money refunded, that was done by using it to satisfy the balance of the indebtedness. But it was not until Blei had made claim to the fund and demanded its payment to him several times.

The evidence respecting the timber involved is that Williamson had sent a number of notices to Ruzic's employees not to cut the trees in question. At first the foreman directed that those trees be cut, but later counter-manded the instructions. Ruzic made no effort to cut the trees. No suit was filed by Williamson to enjoin him from doing so. It is to be noted that the written agreement provided that Ruzic should proceed to remove the trees with reasonable dispatch "and until actually prevented therefrom by injunction"; and, further, that if no suit had been instituted by July 1, 1928, Ruzic should direct the bank to pay over the money to Blei. Under those terms Ruzic certainly was not entitled to the money. There is some unchallenged evidence that Ruzic had gotten a part of the white oak trees and had left the chestnut oaks because he did not want them, as they were not suitable for barrel staves, which he was making out of the logs.

The agreement signed by the two men certainly did not authorize the bank to pay the deposit to Ruzic. We might rest the opinion affirming the judgment upon the rule of following the chancellor in a disputed issue of fact and hold that the bank had knowledge of the terms of that instrument, or upon the failure to deny such knowledge in the pleading. But let us take the cashier's version of the terms of the deposit. It is then simply shown that the bank learned that Ruzic did not get the trees, and hence understood he was entitled to the money. The bank ignored the notices of Blei's claims to the disputed fund made both before and after the expiration of the time limit for closing the escrow. The general rule is that a stakeholder of a deposit should not pay it to either of the parties without the consent of the other, or until the one to whom it is due shall have been definitely ascertained. 6 C. J. 834. The bank had let get away the security for the balance of its loan, and knew that Ruzic was departing for his home in a distant state. The cashier recognized that this fund

was all the bank had to look to, and later put the money in its own pocket to satisfy its claim. So it would appear that it ceased to occupy the altogether indifferent or disinterested position of a stakeholder, or escrow agent. But still leaning toward the bank's defense, and regarding it as a stakeholder, it cannot be relieved of liability.

We extract the following excerpt from Security Trust & Savings Bank v. Carlsen, 205 Cal. 309, 271 P. 100, 103, 470, 60 A. L. R. 630, as defining the duties and responsibilities of a stakeholder:

"In general, every mere stakeholder has assumed some obligation to those interested or owning the property held by him. His obligation is to deliver the property held by him to the party entitled thereto. But, when a disagreement arises as to the ownership of said property, the holder thereof has not obligated himself to settle said disagreement and deliver the property to either of said parties in face of conflicting claims thereto. He may do so, but, in case he does act, he does so at his peril, and, if he delivers the property to one not legally entitled thereto, the legal owner thereof may hold him responsible in damages for such wrongful delivery."

In Montgomery v. Pacific Coast Land Bureau, 94 Cal. 284, 29 P. 640, 28 Am. St. Rep. 122, we have a case where the purchaser at an auction sale made a deposit with the auctioneers as stakeholders, to be held pending examination of the title to the land. The vendor tendered a deed to the purchaser, insisting that his title was perfect, and demanded of the stakeholders that the deposit be paid him. The purchaser also demanded a return of the fund since his counsel advised him that the title was defective. Notwithstanding the vendor's notice to the stakeholders not to return the money to the purchaser, they did so. It was held that when the disputed title was later shown to be good, the deposit then became, according to the terms of the sale, a part of the cash payment, and therefore was the property of the plaintiff; that the stakeholders assumed the risk of paying over the money, and, having made a mistake in paying it to the purchaser, they could not escape their just liability to the vendor as the party entitled to the money.

See, also, 130 Am. St. Rep. 949, note.

Long after the events narrated, because of the failure of Ruzic to pay ground rental to the landowners while the timber remained standing, as he had assumed to pay, the rights in the timber reverted to them. It was then, but not until then, that Williamson filed suit against the landowners and Ruzic testing title to the trees involved. That suit had not been determined when this one was tried. But Williamson's delayed action can have no bearing on this case, for all agree that July 1, 1928, was the decisive date under the terms of the deposit. Whatever had been done or not done then determined who was entitled to the disputed fund. Genuine though the bank's belief was that it was correctly choosing between the rival claimants, it was mistaken also.

The chancellor properly held the bank liable to the plaintiff. Hence, the judgment is affirmed.